# THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

QUALITY PLUS SERVICES, INC.,

    **Plaintiff,**

**v.**                                                  **Civil Action No. 3:18cv454**

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA.,

    **Defendant.**

## MEMORANDUM OPINION

This matter comes before the Court on four motions:

(1)    Defendant National Union Fire Insurance Company of Pittsburgh, PA.'s ("National Union") Motion for Summary Judgment (the "National Union Motion for Summary Judgment"), (ECF No. 20);

(2)    Plaintiff Quality Plus Services, Inc.'s ("Quality Plus") Motion for Summary Judgment (the "Quality Plus Motion for Summary Judgment")[1] (ECF No. 22);

(3)    Quality Plus's Motion to Exclude Testimony of Defendant's Expert, Robert Anderson, Jr. (the "Motion *in Limine*"), (ECF No. 24); and,

(4)    National Union's Motion to Disqualify Kristie G. Haynes (the "Motion to Disqualify"), (ECF No. 33).

Quality Plus and National Union filed Cross-Motions for Summary Judgment pursuant to

Federal Rule of Civil Procedure 56.[2] Quality Plus and National Union have responded to the

---

[1] The Court will refer to the National Union Motion for Summary Judgment and the Quality Plus Motion for Summary Judgment, collectively as the "Cross Motions for Summary Judgment."

[2] Federal Rule of Civil Procedure 56(a) provides, in pertinent part:

(a) **Motion for Summary Judgment or Partial Summary Judgment.** A party may move for summary judgment, identifying each claim or defense . . . on which summary judgment is sought. The court shall grant summary judgment if the

Cross Motions, (ECF Nos. 26, 28), and each has replied, (ECF Nos. 31, 30). National Union responded to the Motion *in Limine*, (ECF No. 27), and Quality Plus replied, (ECF No. 29). Quality Plus responded to the Motion to Disqualify, (ECF No. 38), and National Union replied, (ECF No. 39). These matters are ripe for disposition.

The Court dispenses with oral argument because the materials before it adequately present the facts and legal contentions, and argument would not aid the decisional process. The Court exercises jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).[3] For the reasons stated below, the Court will deny the Cross Motions for Summary Judgment and the Motion *in Limine*. The Court will grant the Motion to Disqualify.

## I. Procedural and Factual Background

In this insurance contract dispute Quality Plus seeks coverage from National Union for five monetary transfers it made based on illegitimate email requests sent to one of Quality Plus's employees. National Union has refused coverage on the ground that the applicable policy provision does not provide coverage and, if it does, several policy exclusions preclude coverage. Before determining that summary judgment would be inappropriate in this matter due to genuine disputes of material fact, the Court sets forth the basic factual and procedural history.

---

movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a).

[3] "The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States." 28 U.S.C. § 1332(a)(1). Quality Plus is a citizen of Virginia, National Union is a citizen of Pennsylvania and New York, and the Complaint alleges damages exceeding $75,000.

## A.      Factual Background[4]

### 1.      Quality Plus's Losses

Between December 19, 2017 and January 4, 2018, a Quality Plus employee, Lynne

Mann, received several emails purportedly from Aaron Gay, the "founder, President, and

Operations Manager of" Quality Plus. (Mem. Supp. Quality Plus Mot. Sum. J. Ex. 1 "Gay

Declaration" 2, 11, 21, 31, 55, 71, ECF No. 23-1.[5]) Gay, the purported sender of the emails, has

the "final approval for all [Quality Plus] invoices" and "make[s] the decisions about who has

authority to handle payments for [Quality Plus], including by wire transfer." (*Id.* 3.)

The five emails unfolded as follows:

(1)      On December 19, 2017, the sender requested that Mann "wire payment for this invoice today." (Gay Decl. 11.) The attached invoice requested a payment of $92,000.00 to Bonachon Enterprises S.A De C.V for "Supply & Delievery [sic] of new Cummins (as per quotation)." (*Id.* 15.) The sender sent this email from Gay's email address aarong1@qpsisbest.com. (*Id.* 12.)

(2)      On December 28, 2017, the sender's email to Mann read: "See if you can get this (QPS) invoice payment wired this morning. I did not copy any one on this to avoid a recurrence of messages not delivering. Let me know when the wired [sic] has been initiated." (*Id.* 21.) The attached invoice requested a payment of $97,384.00 to Bonachon Enterprises S.A DE C.V for "Supply and Delievery [sic] of new Cummins (as per quotation)." (*Id.* 23.) The sender sent this email from a different email address than the one used for the December 19, 2017 email. This new email address—aarong1@qp*i*sisbest.com—was similar to Gay's actual email address. (*Id.* 21.)

---

[4] In recounting the factual history, the Court relates the undisputed facts as articulated in the parties' briefing on both motions for summary judgment. In ruling on each motion, the Court will view the undisputed facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Although the Court ultimately concludes that disputed issues of material fact preclude summary judgment at this stage, the Court sets forth the undisputed facts here.

[5] The indicated page number of each exhibit references the page number as assigned by the Court's CM/ECF System.

(3)     On December 29, 2017, on the same email chain as the December 27, 2017 request, the sender transmitted an email to Mann that said: "See if you can get this wire out today and send me the confirmation. Thanks." (*Id.* 31.) The attached invoice requested a payment of $372,018.00 to Grand Atlantis Limited for "Mechanical, Electrial [sic], Paintings Supplies (As Per Quotation)." (*Id.* 45.) The sender sent this email from the same email address as the December 27, 2017 email—aarong1@qpisisbest.com. (*Id.* 31.)

(4)     On January 3, 2018, on a new email thread, the sender directed a message to Mann that read: "Please see if you can get this wire out this morning and reply with the confirmation." (*Id.* 55.) The attached invoice requested a payment of $558,623.00 to Hinhinghang Trading Co Limited for "Mechanical, Electrical, Paintings Supplies (As Per Quotation)." (*Id.* 63.) Similar to the December 27 and 29, 2017 emails, the sender transmitted this email from aarong1@qpisisbest.com. (*Id.* 55.)

(5)     On January 4, 2018, on the same email thread as the January 3, 2018 request, the sender directed Mann to "[s]end me confirmation as soon as the attached invoice have [sic] been paid via wire. Thanks." (*Id.* 71.) The attached invoice requested a payment of $512,993.00 to HK Futuolong Co Limited for "Mechanical, Electrical, Paintings Supplies (As Per Quotation)." (*Id.* 74.) This final request was also sent from the email address aarong1@qpisisbest.com. (*Id.* 71.)

The December 19 and 28 transfers requested that Mann send the money to Banco Regional de Monterrey in Mexico. (*Id.* 3, 5.) The December 29, January 3, and January 4 transfers requested that Mann send the money to three different banks in Hong Kong. (*Id.* 4–5.) Mann initiated the transfers as requested from Quality Plus's bank. (Mem. Supp. Nat'l Union Mot. Sum. J. Ex. 3 "Mann Deposition" 35, ECF No. 21-3.) Each email contained a signature block purporting to belong to Gay, although several of these signature blocks differed from the others.

Hannah Stalnaker "another member of [Quality Plus's] accounting personnel, approved four of the five transfers." (Mem. Supp. Quality Plus Mot. Sum. J. 5.) Stalnaker did not approve the December 29, 2017 transfer. (*Id.*) For that transfer Mann used Stalnaker's approval code to approve the transfer. (Mann Dep. 23.) To do this, Mann stated that she "[i]nitiate[d] the wire and then [went] back in. It was under the same log-in information. And use[d] [Stalnaker's]

[code] to approve it." (*Id.*) Mann then sent an email to Stalnaker saying "[j]ust in case someone asks, you just approved a 372K wire to hong kong.... lol." (Mann Dep. Ex. 23.)[6]

Quality Plus asserts, and National Union does not dispute, that Gay did not send any of the emails. (Mem. Supp. Quality Plus Mot. Sum. J. 7, ECF No. 23.; *see* Nat'l Union Resp. Quality Plus Mot. Sum. J. 7, ECF No. 28.)

On January 4, 2018, Quality Plus discovered the illegitimate transfers. (Mem. Supp. Quality Plus Mot. Sum. J. 6.) Gay declares that he made the discovery "when two separate events occurred nearly simultaneously:" (1) Gay "took a call from an unknown person requesting approval of a wire transfer that [he] had no knowledge of," and, (2) Gay "received a telephone call from Kristie Haynes, [Quality Plus's] General Counsel, in which she advised [Gay] that . . . Mann informed her that [Mann] had initiated multiple wire transfers that [Gay] knew nothing about." (*Id.*) In its investigation, Quality Plus "did not find any evidence that any [Quality Plus] employee, including . . . Mann and . . . Stalnaker, were knowingly involved in the fraud." (Mem. Supp. Quality Plus Mot. Sum. J. 7; *see* Resp. Quality Plus Mot. Sum. J. 7.)

In late February 2018, Quality Plus learned "from the Hong Kong police . . . that the Hong Kong bank account associated with the January 3, 2018 transfer had been successfully frozen." (Mem. Supp. Quality Plus Mot. Sum. J. 7.) Quality Plus successfully recovered $411,304.69 from January 3rd transfer. (*Id.*) The bank accounts associated with the other transfers "had zero balances." (*Id.* 24.)

---

[6] National Union did not submit Exhibit 23 of the Mann Deposition with its version of the deposition. However, Quality Plus included this exhibit with the portion of the deposition that it submitted. (ECF No. 23-5.)

## 2. The Pertinent Policy Provisions

National Union issued the PrivateEdge Plus Policy No. 01-406-01-90 to Quality Plus for the term of April 1, 2017 to April 1, 2018 (the "Policy"). (Compl. Ex. A "The Policy," ECF No. 1-1.) The Crime Coverage Section of the Policy, which includes coverage for Funds Transfer Fraud, contains a $1,000,000 per occurrence limit of liability with a $10,000 deductible. (*Id.* 4.)

Quality Plus asserts that coverage exists under the Policy's Funds Transfer Fraud Provision.[7] This Provision states: "The Insurer will pay for loss of Funds resulting directly from a Fraudulent Instruction directing a financial institution to transfer, pay or deliver Funds from the Insured's Transfer Account." (The Policy 27.) The Policy defines a Fraudulent Instruction, in pertinent part, as: "an electronic, computer, telegraphic, cable, teletype, telefacsimile, telephone or written instruction initially received by the **Insured** which purports to have been transmitted by an **Employee** but which was, in fact, fraudulently transmitted by someone else without the **Insured's** or the **Employee's** knowledge or consent." (*Id.* 29 (bold in original).)

National Union maintains that coverage does not exist under the Funds Transfer Fraud Provision. If the Court does find that coverage exists under the provision, National Union avers that three exclusions preclude coverage: (1) the Indirect Loss Exclusion; (2) the Fund's Transfer Fraud Exclusion; and, (3) the Employee's Acts Exclusion.[8] (Am. Answer 12–17, ECF No. 19.) The Indirect Loss Exclusion states:

---

[7] In its Complaint, Quality Plus also asserted that coverage existed under the Policy's Computer Fraud Insuring Agreement. (Comp. ¶ 35–36.) However, in its response to National Union's Motion for Summary Judgment, Quality Plus withdrew its reliance on this provision. (*See* Resp. Nat'l Union Mot. Summ. J. 5, ECF No. 26.)

[8] In its Amended Answer, National Union also asserted that the Policy's Confidential Information Exclusion and the Employee Prior Acts Exclusion precluded coverage. (Am. Answer 13–14, 17.) National Union later withdrew its reliance on these exclusions. (*See* Resp. Quality Plus Mot. Summ. J. 20 n.5.)

(f) Indirect Loss

Loss that is an indirect result of an **Occurrence** covered by this **Crime Coverage Section** including, but not limited to, loss resulting from:

(i) the **Insured's** inability to realize income that the **Insured** would have realized had there been no loss of or damage to **Money, Securities** or **Other Property**;

(ii) payment of damages of any type for which the **Insured** is legally liable; provided, however, the **Insurer** will pay compensatory damages arising directly from a loss covered under this **Crime Coverage Section**; or

(iii) payment of costs, fees or other expenses the **Insured** incurs in establishing either the existence or the amount of loss under this **Crime Coverage Section**.

(The Policy 32 (bold in original).) The Policy defines Occurrence, in pertinent part, as

(1) an individual act or event;
(2) the combined total of all separate acts or events whether or not related; or
(3) a series of acts or events whether or not related;
Committed by the same person acting alone or in collusion with other persons, or not committed by any person, during the Policy Period shown in the Declarations, except as provided under Condition 6(a)(xv) or 6(a)(xvi).[9]

(*Id.* 30.) The second exclusion upon which National Union relies is the Fund's Transfer Fraud

Exclusion that states, in pertinent part, that: "Insuring Agreement 1.G., "FUNDS TRANSFER

FRAUD," of this **Crime Coverage Section** does not apply to: . . . (b) Loss due to:

(i) unintentional errors or omissions; or (ii) voluntary giving or surrendering of property in a

purchase or exchange, whether legitimate or fraudulent." (*Id.* 34–35 (bold in original).) Finally,

the third exclusion upon which National Union relies, the Employee's Acts Exclusion, states:

(c) Acts Of Employees, Managers, Directors, Trustees Or Representatives

Loss resulting from **Theft** or any other dishonest act committed by any of the **Insured's Employees, Managers**, directors, trustees or authorized representatives:

(i) whether acting alone or in collusion with other persons; or

(ii) while performing services for the **Insured** or otherwise; except when covered under Insuring Agreement 1.A. of this **Crime Coverage Section**.

_____

[9] Conditions 6(a)(xv) and 6(a)(xvi)—which discuss how to determine coverage amounts for loss sustained prior to the policy—do not affect this analysis because the loss Quality Plus suffered occurred entirely within the applicable Policy period. (*See* Policy 40–42.)

(*Id.* 31 (bold in original).)

In addition to the Policy exclusions, National Union asserts that the Policy's Territory Condition precludes coverage. This Condition states that "This **Crime Coverage Section** covers loss that the **Insured** sustains resulting directly from an **Occurrence** taking place within the United States of America (including its territories and possessions), Puerto Rico and Canada." (*Id.* 43 (bold in original).) Finally, if the Court finds that Quality Plus is entitled to coverage, National Union maintains that Quality Plus's recovery should be reduced by the Policy's Recovery Provision, which states:

> RECOVERIES
> (1) Any recoveries, whether effected before or after any payment under this **Crime Coverage Section**, whether made by the **Insurer** or the **Insured**, shall be applied net of the expense of such recovery:
> (a) First, to the **Insured** in satisfaction of the **Insured's** covered loss in excess of the amount paid under this **Crime Coverage Section**;
> (b) Second, to the **Insurer** in satisfaction of amounts paid in settlement of the **Insured's** claim;
> (c) Third, to the **Insured** in satisfaction of any Deductible Amount; and
> (d) Fourth, to the **Insured** in satisfaction of any loss not covered under this **Crime Coverage Section**.
> (2) Recoveries do not include any recovery:
> (a) from insurance, suretyship, reinsurance, security or indemnity taken for the **Insurer's** benefit; or
> (b) of original **Securities** after duplicates of them have been issued.

(*Id.* (bold in original).)

### 3. Quality Plus's Request for Coverage

On January 5, 2018, Quality Plus notified National Union of its losses. (Gay Decl. 6.) On February 2, 2018, Quality Plus "filed with National Union the required sworn Proof of Loss." (*Id.*) On March 19, 2018, Quality Plus "received National Union's coverage denial letter by email." (*Id.*)

**B.    Procedural History**

Approximately four months after it received National Union's coverage denial letter, Quality Plus filed suit in this Court requesting that the Court "declare the rights of the parties under the Policy" and asserting a breach of contract cause of action. (Compl. 8–9, ECF No. 1.) National Union answered, denying that coverage existed and asserting several affirmative defenses, including that several Policy exclusions preclude coverage.

The Court held an Initial Pretrial Conference with Counsel for both Quality Plus and National Union and scheduled a final pretrial conference and a bench trial. Several months later, Quality Plus and National Union filed the Cross Motions for Summary Judgment. Quality Plus also filed the Motion *in Limine* and National Union filed the Motion to Disqualify.

"Due to the Parties' disagreement concerning the necessity of a trial [in the Cross-Motions for Summary Judgment], and to conserve judicial resources and resources of the Parties, the Court continued generally the final pretrial conference . . . and the bench trial." (May 3, 2019 Order 2, ECF No. 37.) The Court took the motions under advisement.

The Court now turns to those motions. It will first discuss the Cross-Motions for Summary Judgment, which it cannot grant at this stage of the proceedings due to disputed material facts. The Court will then turn to the Motion *in Limine* and the Motion to Disqualify.

## II.  Cross-Motions for Summary Judgment

**A.    Standard of Review:  Rule 56**

Summary judgment under Rule 56 is appropriate only when the Court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that there exists no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *Liberty Lobby*, 477 U.S. at

248–50. "The interpretation of an insurance policy is a question of law that is particularly well suited for summary judgment." *Minn. Lawyers Mut. Ins. Co. v. Protostorm LLC*, 197 F. Supp. 3d 876, 882 (E.D. Va. 2016) (citing *St. Paul Fire & Marine Ins. Co. v. Jacobson*, 826 F. Supp. 155, 157 (E.D. Va. 1993), *aff'd*, 48 F.3d 778 (4th Cir. 1995)).

"A fact is material if the existence or non-existence thereof could lead a [finder of fact] to different resolutions of the case." *Thomas v. FTS USA, LLC*, No. 3:13cv825, 2016 WL 3653878, *4 (E.D. Va. June 30, 2016) (citing *Liberty Lobby*, 477 U.S. at 248). Once a party has properly filed evidence supporting its motion for summary judgment, the nonmoving party may not rest upon mere allegations in the pleadings, but instead must set forth specific facts illustrating genuine issues for trial. *Celotex Corp.*, 477 U.S. at 322–24. The parties must present these in the form of exhibits and sworn affidavits. Fed. R. Civ. P. 56(c).

A court views the evidence and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. *Liberty Lobby*, 477 U.S. at 255. Whether an inference is reasonable must be considered in conjunction with "competing inferences to the contrary." *Sylvia Dev. Corp. v. Calvert Cty.*, 48 F.3d 810, 818 (4th Cir. 1995). Nonetheless, the nonmoving "party is entitled 'to have the credibility of his [or her] evidence as forecast assumed.'" *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) (quoting *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)).

In the end, the non-moving party must do more than present a scintilla of evidence in its favor.

> Rather, the non-moving party must present sufficient evidence such that reasonable jurors could find by a preponderance of the evidence for the non-movant, for an apparent dispute is not genuine within contemplation of the summary judgment rule unless the non-movant's version is supported by sufficient evidence to permit a reasonable [finder of fact] to find the facts in his [or her] favor.

*Sylvia Dev. Corp.*, 48 F.3d at 818 (internal quotations, citations, and alterations omitted). The ultimate inquiry in examining a motion for summary judgment is whether there is "sufficient evidence favoring the nonmoving party for a [finder of fact] to return a verdict for that party. If the [nonmoving party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50 (internal citations omitted). Where the court is faced with cross-motions for summary judgment, as in the instant case, "the court must review each motion separately on its own merits." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003).

## B. Insurance Contract Interpretation Under Virginia Law

As with other contracts, under Virginia law[10] the Court will interpret an insurance policy "in accordance with the intention of the parties gleaned from the words they have used in the document. Each phrase and clause of an insurance contract 'should be considered and construed together and seemingly conflicting provisions harmonized when that can be reasonably done.'" *TravCo Ins. Co. v. Ward*, 736 S.E.2d 321, 325 (Va. 2012) (quoting *Floyd v. Northern Neck Ins. Co.*, 427 S.E.2d 193, 196 (Va. 1993)). "It is axiomatic that when the terms in a contract are clear and unambiguous, the contract is construed according to its plain meaning." *Id.* (quoting *Barber v. VistaRMS, Inc.*, 634 S.E.2d 706, 712 (Va. 2006)). "Words that the parties used are normally given their usual, ordinary, and popular meaning. No word or clause in the contract will be

---

[10] The parties properly agree that the Court must analyze the insurance policies pursuant to Virginia contract law. *See Klein v. Verizon Commc'ns, Inc.*, 674 Fed. App'x 304, 307–08 (4th Cir. 2017) (finding that a federal court sitting in diversity must apply the choice-of-law provisions of the state in which it sits, and that under Virginia law "lex loci contractus [or the law of the place of the contract] serves as the default rule"); *Buchanan v. Doe*, 246 Va. 67, 70–71 (1993) (finding that under Virginia state law, "the law of the place where an insurance contract is written and delivered controls issues as to its coverage"). National Union asserts that it "delivered the Policy to [Quality Plus] in Petersburg, Virginia. (Mem. Supp. Nat'l Union Mot. Sum. J. 10 n.4.) Therefore, the Court will apply Virginia contract law to this matter.

treated as meaningless if a reasonable meaning can be given to it, and there is a presumption that the parties have not used words needlessly." *Id.* (quoting *City of Chesapeake v. States Self-Insurers Risk Retention Group, Inc.*, 628 S.E.2d 539, 542 (Va. 2006)).

"Virginia law draws a distinction between the burden of proof for proving coverage and the burden of proof for demonstrating the applicability of an exclusion in an insurance policy." *Capitol Prop. Mgmt. Corp. v. Nationwide Prop. & Cas. Ins. Co.*, 261 F. Supp. 3d 680, 689–90 (E.D. Va. 2017). First, "the insured bears . . . [the] burden to establish a *prima facie* case that coverage should be triggered. In other words, the burden is on the policyholder at the outset to bring himself within the terms of the policy." *Id.* "Virginia has long followed the rule that if the insured fails to fulfill a condition of an insurance policy, the insurer's coverage obligation is not triggered." *Bryan Bros. Inc. v. Cont'l Cas. Co.*, 660 F.3d 827, 830 (4th Cir. 2011) (citations omitted). Second, "[o]nce the policyholder makes out a *prima facie* case, the burden shifts to the insurance company to prove an affirmative defense," which includes policy exclusions. *SunTrust Mortg., Inc. v. AIG United Guar. Corp.*, 800 F. Supp. 2d 722, 731 (E.D. Va. 2011) (citation omitted).

In determining whether the policyholder and the insurance company have met their burdens of proof, Virginia law requires the reviewing court to apply certain inferences. Specifically,

> [i]nsurance policies are contracts whose language is ordinarily selected by insurers rather than by policy-holders. The courts, accordingly, have been consistent in construing the language of such policies, where there is doubt as to their meaning, in favor of that interpretation which grants coverage, rather than that which withholds it. Where two constructions are equally possible, that most favorable to the insured will be adopted. Language in a policy purporting to exclude certain events from coverage will be construed mostly strongly against the insurer.

*TravCo Ins. Co.*, 736 S.E.2d at 325 (quoting *PBM Nutritionals, LLC v. Lexington Ins., Co.*, 724 S.E.2d 707, 713 (Va. 2012)). In accordance with this standard of review, "it is incumbent upon the insurer to employ exclusionary language that is clear and unambiguous." *SunTrust Mortg., Inc.*, 800 F. Supp. 2d at 731 (citation omitted).

However, when no ambiguity exists "there is no reason for applying the rules of contra proferentem[11] or liberal construction for the insured." *TravCo Ins. Co.*, 736 S.E.2d at 325 (quoting *PBM Nutritionals, LLC*, 724 S.E.2d at 713). "[A]n insurance policy is not ambiguous merely because courts of varying jurisdictions differ with respect to the construction of policy language." *Id.* (quoting *PBM Nutritionals, LLC*, 724 S.E.2s at 713). When the terms of the policy are clear, the Court need not look to decisions from other jurisdictions to interpret the policy. *See id.* at 324.

## C. Genuine Issues of Material Facts Preclude Summary Judgment in this Matter[12]

Although the Parties raise a number of disputes of fact, only two genuine issues of material fact preclude summary judgment in this matter. First, because the Parties dispute the location from which the sender transmitted the emails, the Court cannot determine whether coverage applies under the Funds Transfer Fraud provision because of the Policy's Territory condition. Second, because the Parties dispute the number of people who sent the emails, the Court cannot determine whether the emails constitute one Occurrence under the Policy or

---

[11] "Contra Proferentem" is "[t]he doctrine that, in the interpretation of documents, ambiguities are to be construed unfavorably to the drafter." *Contra Proferentem*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[12] Although the Court ordinarily must consider each motion for summary judgment on its own, *see Rossignol*, 316 F.3d at 523, because the Court would reach the same outcome on both the Quality Plus Motion for Summary Judgment and the National Union Motion for Summary Judgment, the Court addresses both motions together.

multiple Occurrences.  This goes to the appropriate amount, if any, of damages due to Quality Plus.

### 1. A Genuine Issue of Material Fact Exists as to the Location From Which the Sender Transmitted the Emails

Because a genuine issue of material fact exists as to the location from which the sender transmitted the emails, Quality Plus cannot meet its burden of showing that it is entitled to coverage under the Policy at this procedural posture.  To reach this conclusion, the Court must first determine the proper meaning of the Policy's Territory Provision combined with the Policy's definition of Occurrence.  Second, the Court will discuss the implication of the Parties' dispute of material fact.

#### a. Under the Policy, the Occurrence is the Sending of the Emails

Under Virginia law, the Court will interpret an insurance policy "in accordance with the intention of the parties gleaned from the words they have used in the document.  Each phrase and clause of an insurance contract 'should be considered and construed together and seemingly conflicting provisions harmonized when that can be reasonably done.'"  *TravCo Ins. Co.*, 736 at 325 (quoting *Floyd*, 427 S.E.2d at 196).  "It is axiomatic that when the terms in a contract are clear and unambiguous, the contract is construed according to its plain meaning."  *Id.* (quoting *Barber*, 634 S.E.2d at 712).

The Policy includes a Territory condition that depends, in part, on the definition of Occurrence as set forth in the Policy.  The Territory Condition states

> [t]his **Crime Coverage Section** covers loss that the **Insured** sustains resulting directly from an **Occurrence** taking place within the United States of America (including its territories and possessions), Puerto Rico and Canada.

(Policy 43 (bold in original).)

The Policy defines Occurrence, in pertinent part, as

(1) an individual act or event;
(2) the combined total of all separate acts or events whether or not related; or
(3) a series of acts or events whether or not related;

committed by the same person acting alone or in collusion with other persons, or not committed by any person, during the Policy Period shown in the Declarations, except as provided under Condition 6(a)(xv) or 6(a)(xvi).[13]

(*Id.* 30.)

Looking to the plain language of the Policy and construing the Territory Condition with the definition of Occurrence, *TravCo Ins. Co.*, 736 S.E.2d at 325, it becomes clear that the Occurrence is the act or event that "directly" causes the insured's loss. (*See* Policy 43 (Territory Condition).) Therefore, Quality Plus's losses alone cannot serve as the Occurrence. Although the Policy provides a broad definition of Occurrence, Mann's receipt of the emails and her actions in requesting that Quality Plus's bank pay the attached invoices, cannot be the Occurrence. This is so because under the Policy language, the "loss" must result "directly from" an Occurrence and the loss here flowed directly from the emails sent to Quality Plus. *See Principle Sols. Group, LLC v. Ironshore Indem., Inc.*, 944 F.3d 886, 893 (11th Cir. 2019) (finding coverage under a similar policy because under Georgia law, the loss resulted directly from a fraudulent email and the employee's actions did not break the causal chain). Without the emails, Quality Plus would not have suffered the losses.

Similarly, if the sender's transmission of the emails constitutes the Occurrence, Mann's actions cannot be included in the Occurrence because the Policy's definition of Occurrence requires that the act or event be "[c]omitted by the same person acting alone or in collusion with

---

[13] Conditions 6(a)(xv) and 6(a)(xvi)—which discuss how to determine coverage amounts for loss sustained prior to the policy—do not affect this analysis because the loss Quality Plus suffered occurred entirely within the applicable Policy period. (*See* Policy 40–42.)

other persons." (Policy 30.) To act in collusion requires "[a]n agreement to defraud another or to do or obtain something forbidden by law." *Collusion*, BLACK'S LAW DICTIONARY (11th ed. 2019). Quality Plus asserts, and National Union does not contest, that Quality Plus "did not find any evidence that any [Quality Plus] employee, including . . . Mann . . . were knowingly involved in the fraud." (Mem. Supp. Quality Plus Mot. Sum. J. 7; *see* Resp. Quality Plus Mot. Sum. J. 7.) For this reason, no evidence suggests that Mann acted "in collusion" with the sender of the emails. (*See* Policy 30.) Therefore, Mann's actions cannot be included as a part of the Occurrence.

Looking to the plain language of the contract and construing the Territory Condition in accordance with the definition of Occurrence, the Occurrence in this case is the transmission of the emails by the sender.

### b. Because the Parties Dispute the Location from Which the Sender Transmitted the Emails, the Court Must Deny the Cross Motions for Summary Judgment

Under Virginia law, Quality Plus bears the burden to establish a *prima facie* case that coverage exists. *Capitol Prop. Mgmt. Corp.*, 261 F. Supp. 3d at 689–90. "Virginia has long followed the rule that if the insured fails to fulfill a condition of an insurance policy, the insurer's coverage obligation is not triggered." *Bryan Bros. Inc.*, 660 F.3d at 830. As noted above, the Court has concluded that under the plain language of the Policy the sender transmitting the emails serves as the Occurrence. The Policy's Territory Condition requires that the Occurrence take place within the defined territory. Because the Parties dispute the location from which the sender transmitted the emails, and each Party supplies exhibits in support of its position, a dispute of material fact exists. The Court must deny the Cross Motions for Summary judgment.

Quality Plus asserts that "there is no evidence that the perpetrators sending the initial fraudulent instructions were located outside the United States. The fact that the originating IP address shown in the headers of these emails may show a Nigerian location is irrelevant." (Mem. Supp. Quality Plus Mot. Sum. J. 22.) In support of its argument, Quality Plus posits that "National Union admits, 'IP . . . addresses in an email header can be fabricated or spoofed.'" (*Id.* (quoting Mem. Supp. Quality Plus Mot. Sum. J. Ex. 4 "National Union Admissions" 15, ECF No. 23-4).) Quality Plus also asserts that Gay spoke with one of the purported senders on the telephone and that during that call, the person "sounded American, with no identifiable accent." (*Id.* (citing Gay Decl. 5).)

In response, National Union maintains that "discovery demonstrates multiple disputed issues of material fact [exist] on this issue." (Resp. Quality Plus Mot. Sum. J. 25.) National Union first submits information to show that Quality Plus previously recognized that the IP address was assigned to NATCOM in Nigeria. Similarly, National Union submits information showing that Quality Plus identified the IP address as Nigerian to the FBI Special Agent working on the case. (*Id.* (citing Resp. Mot. *In Lim.* Ex. R, ECF No. 27-2).) As addressed in the Motion *in Limine*, National Union seeks to have an expert testify that the sender transmitted the emails from outside the United States. Quality Plus seeks to exclude this expert in the Motion *in Limine*.

Resolution of this issue "could lead a [finder of fact] to different resolutions" as to whether coverage exists under the Policy. *Thomas*, 2016 WL 3653878, at *4. If the finder of fact found that the sender transmitted these emails from Nigeria, then the Policy would not afford coverage to Quality Plus because it could not show that it met a condition of the Policy. *See Bryan Bros., Inc.*, 660 F.3d at 830. Alternatively, if the finder of fact found that the IP address

was spoofed and, based on the telephone call, the email was transmitted from within the defined Territory, then the Policy could afford coverage to Quality Plus. Therefore, a genuine issue of material fact exists. This precludes summary judgment.

Once a party has properly filed information supporting its motion for summary judgment, the nonmoving party may not rest upon mere allegations in the pleadings, but instead must set forth specific facts illustrating genuine issues for trial. *Celotex Corp.*, 477 U.S. at 322–24. Both Parties have done so. Based on this disputed fact, which affects the application of the Territory condition, the Court cannot award summary judgment on the issue of coverage. *See id.*

### 2. A Genuine Issue of Material Fact Exists as to Who Sent the Emails

Even if the Court could award summary judgment on the issue of coverage, this matter would have to proceed toward a bench trial on the issue of damages. Here, the Parties dispute whether one person or multiple people sent the emails to Mann requesting the transfers. The outcome of this dispute determines the correct amount, if any, of damages due to Quality Plus under the Policy.

The Policy includes a $1,000,000 per Occurrence limit of liability with a $10,000 deductible. (Policy 4.) As discussed above, the Policy defines Occurrence, in pertinent part, as

> (1) an individual act or event;
> (2) the combined total of all separate acts or events whether or not related; or
> (3) a series of acts or events whether or not related;
>
> committed by the same person acting alone or in collusion with other persons, or not committed by any person, during the Policy Period shown in the Declarations, except as provided under Condition 6(a)(xv) or 6(a)(xvi).

(Policy 30.)

The Parties dispute whether the five transactions constitute five separate transactions—each with a $1,000,000 liability limit—or one single transaction—with an overall $1,000,000

18

liability limit. Quality Plus asserts that "unknown parties pretended to be . . . Gay and sent five separate email instructions" to Mann. (Mem. Supp. Quality Plus Mot. Sum. J. 5.) In support of its contention, Quality Plus states that its losses resulted from "five separate transactions, occurring over a seventeen-day period involving four different banks in two different countries on two different continents," suggesting that these facts run counter to the finding that just one sender was involved. (*Id.* 24.) It also contends that it successfully recovered money from only one account and that all of the other accounts contained zero balances, meaning that not all accounts were treated the same way. This could also counsel against finding only one sender involved. (*Id.*) Finally, Quality Plus maintains that the signature blocks "changed throughout the transactions," specifying that the emails contained at least four different signature blocks. (*Id.* 24–25.) This too could lead to an inference that different actors sent the emails.

In contrast, National Union "contends that the emails were sent by the same person acting alone or acting in collusion with other persons." (Resp. Quality Plus Mot. Sum. J. 4.) In support of its position, National Union states that "the first and second emails attached invoices that contained the identical bank account information in connection with the purchase of a 'Cummins.' . . . Also, the third, fourth, and fifth invoices were for 'Mechanical, Electrical, Paintings Supplies (As Per Quotation).'" (*Id.* 26.) It further asserts that "the second through fifth invoices were all routed through the same email address at the qp*i*sisbest.com domain and shared an IP address from a common location." (*Id.*) National Union maintains that "[t]he January 4, 2018 email to Ms. Mann (the fifth wire) was a continuation of the January 3, 2018 email chain between the sender and Ms. Mann, suggesting they were sent by the same sender." (*Id.* 27.)

Even taking into account, as Quality Plus asks, that National Union admitted that IP addresses can be spoofed, the Court cannot decide this genuine issue of material fact at the Motion for Summary Judgment phase. Resolution of this issue "could lead a [finder of fact] to different resolutions of the" amount of appropriate damages. *Thomas*, 2016 WL 3653878, at *4. Specifically, if a finder of fact found that the same person sent the emails, such that they constitute the same Occurrence under the Policy, then Quality Plus's damages would be capped at $1,000,000. However, if the finder of fact found that different people sent the emails, such that more than one Occurrence exists, then Quality Plus would be entitled to recover the full amount of its damages, less the amount it recovered from the Hong Kong bank account. Both Parties appropriately point to information submitted with their filings on the Cross Motions for Summary Judgment—such as exhibits and sworn affidavits—to support their position. *See Celotex Corp.*, 477 U.S. at 322–24; Fed. R. Civ. P. 56(c). Therefore, this dispute of material fact precludes summary judgment.

**D.    Conclusion:  Cross-Motions for Summary Judgment**

Because genuine issues of material fact exist, the Court cannot grant summary judgment[14] and this matter must proceed to a bench trial on both the issue of coverage and the

---

[14] Quality Plus asserts in its Complaint that National Union denied coverage in bad faith. (Compl. 8.) "Virginia law does not recognize an independent cause of action for bad faith," rather "[b]ad faith is only a source of additional recovery on a breach of contract claim against the insurer." *Capitol Prop. Mgmt. Corp.*, 261 F. Supp. 3d at 693–94 (citations omitted). "A judgment against the insurer acts [as] a condition precedent to any claim of bad faith in Virginia[.]" *Id.* (second alteration in original) (citation omitted). Because the Court cannot decide Quality Plus's breach of contract claim on these Cross Motions for Summary Judgment, the Court cannot decide Quality Plus's bad faith claim.

proper amount, if any, of damages.[15]  The Court now turns to the pending Motion *in Limine* and Motion to Disqualify.

### III.  Motion *in Limine*

In the Motion *in Limine*, Quality Plus seeks to exclude National Union's expert Robert Anderson, Jr.  National Union relies on Anderson's report to support its contention that the emails are similar to one another and that the sender transmitted the emails from Nigeria. Because Anderson meets each of the qualifications to testify as an expert, the Court will deny the Motion *in Limine*.

**A.     Anderson's Background and Proffered Testimony**

Anderson, the Chief Executive Officer of Cyber Defense Labs, possesses an "Associate of Arts degree in Criminal Justice from Widener University, as well as a Bachelor of Science and a Master in Public Administration from Wilmington University." (Mem. Supp. Mot. *in Lim.* Ex. 1 "Anderson Report" 8, ECF No. 25-1.)  His credentials include time as a trooper with the Delaware State Police and a variety of roles throughout a twenty-year career with the Federal Bureau of Investigation, including the "Executive Assistant Director of the Criminal, Cyber, Response and Services branch—the number three position at the agency with control of six divisions and approximately 24,000 employees." (*Id.*)  Anderson then became the "Managing Director and head of the Global Cyber Risk and Information Security Services Practice" at Navigant Consulting. (*Id.*)  He later "joined the Chertoff Group" where he served as the

---

[15] The Court notes that if Quality Plus were to meet its burden to show that the sender transmitted the emails from within the defined Territory, and the Court were to reach the issue of coverage under the Policy, it would likely find that coverage existed.  The Funds Transfer Fraud provision appears to be ambiguous when read with the applicable definition of Fraudulent Instruction.  Under Virginia law, the Court would have to adopt a meaning "in favor of that interpretation which grants coverage, rather than that which withholds it." *See TravCo Ins. Co.*, 736 S.E.2d at 325 (quoting *PBM Nutritionals, LLC*, 724 S.E.2d at 713).

Principal and "the leader of its Strategic Advisory Services Branch, to include Risk, Information Security and Cyber." (*Id.*) Finally, he moved to Cyber Defense Labs.

Anderson asserts that he has "overseen, advised, and directed strategic initiatives and operations for high profile international investigations in partnership with Fortune 50 companies" and many federal agencies. (*Id.* 9.) He avers that "[t]hese matters often involved economic, corporate and other forms of espionage, counter-proliferation, fraud, counterterrorism, hostage negotiations and rescues, and a wide variety of cyber and criminal cases resulting in numerous felony convictions." (*Id.*) Specifically, Anderson proclaims that he "was in charge of the Sony Pictures Entertainment data breach investigation, the US Office of Personnel Management . . . breach investigation, Edward Snowden and the Anthem breach investigation, among many others." (*Id.*) He states that he has "led over 2,000 breach response investigations in the private sector to include criminal, ransomware, email compromise (including phishing and/or spoofing), malware and nation state attacks." (*Id.*)

After discussing general background of cybersecurity, different types of cyber attacks, and criminal organizations that carry out these attacks, Anderson identifies nine conclusions that he makes "[b]ased on [his] review of all the information presented by [Quality Plus] in this case." (*Id.* 18–19.) He also sets forth two opinions "based on a reasonable degree of certainty in [his] field." (*Id.* 20.)

His conclusions include:

(1)     The compromise was likely initiated by a phishing email to an employee of [Quality Plus], where the [Quality Plus] employee disclosed confidential information, account credentials, that likely allow[ed] the attacker to get into the [Quality Plus] email system. (*Id.* 18.)

(2)     The attacker utilized an originating client IP address of 129.56.12.21 traced to Nigeria on January 9, 2018. This IP address was also utilized on the initial transfer of funds on December 19, 2017. Based on by review, I

have a strong degree of confidence that the December 19th emails originated from Nigeria and that the attacker was physically located in Nigeria. (*Id.*)

(3)     The methodology that was utilized for the entire scam fits the profile of Nigerian criminal organizations or individual's that have perpetrated these attacks for several years from Africa. The entire scheme appears to be the same person or group perpetrating this fraud due to the similarities of emails, invoices, and IP addresses, along with several sustained fraudulent invoices sent back to back to [Quality Plus]. (*Id.* 19.)

(4)     The emails from the spoofed email domain QPISISBEST.COM were all routed through the same IP address and originated from the same spoofed email address. This further shows that a single bad actor was involved. While this IP address attempted to mask the Nigerian origin, this practice of routing emails through at least one compromised IP address is consistent with my experience and is a tacti[c] commonly used by Nigerian individuals and groups. Further, based on the fact that [Quality Plus] had already made payment of more than 90K to the criminal, I am confident that the attacker would continue to attempt the same fraud against the same victim, [Quality Plus]. (*Id.*)

His two opinions are:

(1)     [T]hat the fraud perpetrated against [Quality Plus] in 2017 and 2018 was very likely, and certainly more likely than not, perpetrated by an African based criminal group or individual and it was motivated by financial gain. The fraud was likely made possible originally through an email phishing campaign, in which [Quality Plus] account credentials were compromised. Later, first using access to the legitimate Aaron Gay email account, and later using a spoofed email domain QPISISBEST.COM, the attacker sent emails with phony invoices to [Quality Plus]. (*Id.* 20.)

(2)     [B]ased on the [modus operandi] that I have observed from the review of documents and evidence, the same criminal group or individual from outside the United States, and specifically in Africa, was responsible for the [Quality Plus] attack and for all five fraudulent invoices. (*Id.*)

The Court now turns to the legal standard by which it must evaluate whether to allow

Anderson to testify as an expert in this matter.

**B.    Legal Standard:  Federal Rule of Evidence 702**

Federal Rule of Evidence 702 "imposes a special obligation upon a trial judge to 'ensure

that any and all [expert] testimony . . . is not only relevant, but reliable.'" *Kumho Tire Co. v.*

*Carmichael,* 526 U.S. 137, 147 (1999) (*quoting Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S.

579, 589 (1993) (second alteration in original)).

Rule 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training,
or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help
the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and[,]
(d) the expert has reliably applied the principles and methods to the facts of
the case.

Fed. R. Evid. 702.  "Expert testimony is admissible under Rule 702, then, if it concerns

(1) scientific, technical, or other specialized knowledge that (2) will aid the [finder of fact] or

other trier of fact to understand or resolve a fact at issue." *Westberry v. Gislaved Gummi AB,*

178 F.3d 257, 260 (4th Cir. 1999) (citing *Daubert,* 509 U.S. at 592).  The first prong of the

inquiry "necessitates an examination of whether the reasoning or methodology underlying the

expert's proffered opinion is reliable," and the second prong "requires an analysis of whether the

opinion is relevant to the facts at issue." *Id.*

In determining whether proffered expert testimony is sufficiently reliable so as to assist

the trier of fact, *Daubert* suggests that courts consider several non-dispositive factors:

(1) whether the expert's methodology can be tested; (2) whether the theory or technique has been

subjected to peer review and publication; (3) the known or potential rate of error; and,

(4) whether the theory or technique has gained general acceptance within the relevant scientific

community. *Daubert*, 509 U.S. at 593–94. This analysis applies to all proffered specialized knowledge, not solely scientific expert testimony. *Kumho Tire*, 526 U.S. at 141. Despite these factors, "[t]he inquiry to be undertaken by the district court is 'a flexible one' focusing on the 'principles and methodology' employed by the expert, not on the conclusions reached." *Westberry*, 178 F.3d at 261 (quoting *Daubert*, 509 U.S. at 594–95).

A district court "need not determine that the expert testimony a litigant seeks to offer into evidence is irrefutable or certainly correct. . . . As with all other admissible evidence, expert testimony is subject to being tested by '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Id.* at 261 (quoting *Daubert*, 509 U.S. at 596) (alteration in original) (internal citation omitted). The "court should be mindful that Rule 702 was intended to liberalize the introduction of relevant expert evidence." *Id.*

Rule 702 applies in a bench trial, albeit somewhat differently. "Since Rule 702 is aimed at protecting jurors from evidence that is unreliable for reasons they may have difficulty understanding, in a bench trial there is greater discretion regarding procedure and even the stringency of gatekeeping." 29 Victor J. Gold, Federal Practice and Procedure § 6270 (2d ed. 2019) (citing cases). "[I]n a bench trial the court may admit expert testimony subject to excluding it later if the court concludes it is unreliable." *Id.* (citing cases).

## C.     Analysis:  Anderson Meets Each of the Requirements of Rule 702

Because Anderson meets each of the requirements of Rule 702, the Court will deny the Motion *in Limine*. The Court addresses each Rule 702 factor in turn.

### 1. Anderson's Specialized Knowledge Will Assist the Trier of Fact

Rule 702(a) states that a qualified expert may testify "in the form of an opinion" if "the expert's . . . specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a).

It is undisputed that Anderson possesses the requisite qualifications to act as an expert in this matter. (*See* Resp. Mot. *in Lim.* 4–5, ECF No. 27; Reply Mot. *in Lim.* 1, ECF No. 29 (Quality Plus "does not challenge . . . Anderson's qualifications as an expert.").) Based on his background and his central role in a number of high profile investigations, the Court agrees that Anderson is qualified as a cybersecurity expert.

Anderson's opinions that the fraud "was very likely, and certainly more likely than not, perpetrated by an African based criminal group or individual and it was motivated by financial gain" and that "the same criminal group or individual from outside the United States, and specifically in Africa" will assist the trier of fact in determining whether coverage exists under the Policy. (Anderson Report 20.) Specifically, as explained *supra*, whether the sender transmitted the emails outside the defined Territory will go to the ultimate issue of whether or not coverage exists. The number of people who transmitted the emails will also affect the amount, if any, that Quality Plus may recover under the Policy. Therefore, the opinions that Anderson provides will assist the Court in "determin[ing] a fact in issue." Fed. R. Evid. 702(a).

### 2. Anderson Based His Opinions On Sufficient Facts

The second prong of Rule 702 requires that the expert base his or her testimony on "sufficient facts or data." Fed. R. Evid. 702(b). Here, Anderson states that he reviewed "several court filings in this case, the documents produced by the parties, and public documents." (Anderson Report 10.) He states that he "underst[ood] that these materials constitute all

materials produced by [Quality Plus] in this case." (*Id.*) He lists each of these documents in an appendix to his report. National Union clarifies, and Quality Plus does not appear to dispute, that these documents included the emails, the invoices, and the IP address information that Quality Plus produced in discovery. However, the Parties dispute whether the information Anderson reviewed satisfies this prong of Rule 702.

Quality Plus asserts that "[n]owhere does [Anderson] list what testing or work he did to identify the actual perpetrators or their location here." (Mem. Supp. Mot. *in Lim.* 8.) Quality Plus also maintains that although Anderson states in his March 1, 2019 report that he reviewed deposition transcripts, "the first deposition was not taken in this case until March 18, 2019." (*Id.* 5.) It also avers that the trace of the emails Anderson reviewed "was not done by . . . Anderson or anyone working at his direction, and . . . Anderson does not appear to have done any work to trace any of the emails himself." (*Id.*)

National Union, however, maintains that Anderson's failure to analyze the computer system itself results from Quality Plus's failure to preserve the system following the attacks.[16] (Resp. Mot. *in Lim.* 12.) National Union asserts that Anderson "traced emails associated with each [of] the five wires based on the documents available to him." (*Id.*)

The Court notes its grave concern regarding Anderson's report, particularly his statement that he reviewed deposition transcripts when they were not yet available. However, a district court "need not determine that the expert testimony a litigant seeks to offer into evidence is

---

[16] National Union appears to raise a spoliation argument in its response to the Motion *in Limine*. (Resp. Mot. *in Lim.* 12 ("Such failure, when [Quality Plus] anticipated litigation against National Union, gives rise to spoliation concerns and suggests that [Quality Plus] was hoping to engineer a situation where no one could second guess its unsupported allegation that five different actors sent the emails from somewhere inside the United States.").) Because National Union makes this argument for the first time in response to the Motion *in Limine*, without any legal citation, the Court declines to consider it when ruling on the pending motions.

irrefutable or certainly correct. . . . [Because a]s with all other admissible evidence, expert testimony is subject to being tested by '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Westberry*, 178 F.3d at 261 (quoting *Daubert*, 509 U.S. at 596) (alteration in original) (internal citation omitted). Quality Plus will be able to address this and any other aspect of the sufficiency of the evidence that Anderson reviewed when cross-examining Anderson at the upcoming bench trial. At this procedural posture, because it appears that Anderson reviewed at least the available material regarding the illegitimate emails, Anderson bases his testimony on "sufficient facts or data." Fed. R. Evid. 702(b).

### 3. Anderson's Testimony Is the Product of Reliable Principles and Methods

Rule 702(c) requires that an expert's testimony be the "product of reliable principles and methods." Fed. R. Evid. 702(c). "In arriving at an opinion, an expert may rely on many types of information, which may, but is not required to, include conducting tests." *Flynn v. CVA US LLC*, No. 15-cv-0855, 2018 WL 2063871, at *4 (S.D. Ill. Jan. 31, 2018).

Anderson did not perform tests to arrive at his opinions, instead relying on his expertise and several publications discussed in his report. Anderson discusses the background principles of cybersecurity and different types of cyber attacks at length. For example, citing Verizon's 2018 Data Breach Investigations Report, Anderson states that "there were 53,308 reported security incidents [in] 2017, with 2,216 confirmed data breaches." (Anderson Report 13.) He also states that "[t]he most common form of identity theft . . . involves the fraudulent use of a victim's personal information for financial gain." (*Id.* (citing Federal Trade Commission, Guide for Assisting Identity Theft Victims 4 (2013), https://www.consumer.ftc.gov/articles/pdf-0119-guide-assisting-id-theft-victims.pdf).)

He draws on similar sources to discuss the different types of criminal organizations that engage in cybercrime. Specifically, he cites a report that states "[s]ecurity researchers have detected a rise in attacks from Nigerian cyber criminal who they say pose a 'formidable' threat to businesses across the globe. According to a report released Tuesday by Palo Alto Networks, hackers working out of Nigeria initiated an average of 17,600 attacks per month over the past year." (*Id.* 15–16 (citing Morgan Chalfant, Researchers Detect Rise in Attacks from Nigerian Cyber Criminals, *The Hill.com*, May 5, 2018).)

Although Quality Plus challenges the principles and methods that Anderson relies on in making his opinions, this goes to the weight afforded to Anderson's testimony, not to admissibility. Quality Plus can test Anderson's findings on cross-examination. At this stage in the proceedings, Anderson's reliance on his experience and the publications available in the field of cybersecurity show that his testimony "is the product of reliable principles and methods." Fed. R. Evid. 702(c).

### 4. Anderson Reliably Applied the Principles and Methods to the Facts of This Case

Finally, Rule 702 requires that an expert "reliably appl[y] the principles and methods to the facts of the case." Fed. R. Evid. 702(c).

Here, Anderson states that he bases his two opinions on his "investigation, analysis, knowledge, education, training and experience." (Anderson Report 20.) Anderson's opinion that the fraud on Quality Plus was "perpetrated by an African based criminal group or individual" appears consistent with Quality Plus's own conclusion that the IP address could be traced to Nigeria. (Anderson Report 20.)

Quality Plus may test Anderson's testimony in cross-examination at trial. Because this matter proceeds to a bench trial in which the Court acts as the finder of fact, Rule 702 affords the

Court "greater discretion" in exercising its gatekeeping function under Rule 702. Federal Practice & Procedure § 6270. For this reason, and because it appears that Anderson meets the required elements of Rule 702, the Court will allow Anderson to testify as a cybersecurity expert. However, if at trial the Court concludes that Anderson's testimony is not reliable, it may exclude his testimony. *See* Fed. Practice & Procedure § 6270 ("[I]n a bench trial the court may admit expert testimony subject to excluding it later if the court concludes it is unreliable.").

### D.   Conclusion: Motion *in Limine*

For the foregoing reasons, the Court will deny the Motion *in Limine* and will allow Anderson to testify as an expert at the upcoming trial.[17] The Court now turns to the Motion to Disqualify.

---

[17] Quality Plus also seeks to exclude Anderson's testimony on the ground that National Union's expert disclosure for Anderson fails the requirements of Federal Rule of Civil Procedure 26(a)(2)(B).

This Rule requires that the witness prepare and sign "a written report" that contains:

(i) a complete statement of all opinions the witness will express and the basis and reasons for them;
(ii) the facts or data considered by the witness in forming them;
(iii) any exhibits that will be used to summarize or support them;
(iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;
(v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
(vi) a statement of the compensation to be paid for the study and testimony in the case.

Fed. R. Civ. P. 26(a)(2)(B).

Anderson's written report includes all of the required information except the publications he has authored in the previous 10 years. In its Response to the Motion *in Limine*, National Union asserts that "Anderson has not authored any formal publications within the previous ten years." (Resp. Mot. *in Lim.* 14 n. 2.)

Although this disclosure should have been made in National Union's expert report, its failure to include this information was harmless. *See, e.g.*, *Smith v. Allstate Ins. Co.*, 912 F. Supp. 2d 242, 249–50 (W.D. Pa. 2012). Quality Plus does not assert that it has been prejudiced by this omission and because Anderson has not authored any publications, it will not harm Quality Plus's trial preparation because no publications exist to review. Further, nothing in the

## IV. Motion to Disqualify

In the Motion to Disqualify, National Union seeks to exclude Kristie Haynes from acting as trial counsel for Quality Plus. Because Ms. Haynes will likely represent a necessary witness, the Court will grant the Motion to Disqualify and disqualify Ms. Haynes from acting as trial counsel for Quality Plus at the upcoming bench trial. Ms. Haynes may continue to work on this matter when not in trial.

### A.    Relevant Background

In its Complaint, Quality Plus identifies Kristie Haynes and Nathan Colarusso as its counsel. (Compl. 10, ECF No. 1.) Ms. Haynes serves as General Counsel to Quality Plus. (*Id.*) Following the losses, Ms. Haynes "was responsible for, among other things, handling all detailed communications with the overseas banks and U.S. and foreign law enforcement authorities, including providing all documentation required by the FBI and Secret Service and Hong Kong police. She handled all communication with outside Hong Kong counsel hired for recovery." (Gay Decl. 7.)

National Union also states that "before [Quality Plus] sued National Union, Ms. Haynes was the primary point of contact between [Quality Plus] and National Union on the issues central to this coverage dispute." (Mem. Supp. Mot. Disqualify 2, ECF No. 34.) National Union submits its notes, taken contemporaneously with the conversations, to show that Ms. Haynes contacted it several times to discuss coverage under the Policy. (*Id.* (citing Mem. Supp. Mot. Disqualify Ex. V, ECF No. 34-2).)

---

record suggests that the failure to confirm that no publications existed as anything more than an honest mistake. Finally, no delay will result from National Union's failure to include this information in Anderson's expert disclosure. For these reasons, the Court denies the Motion *in Limine* on this ground as well.

National Union moves to disqualify Ms. Haynes under Virginia Rule of Professional

Conduct 3.7(a) because National Union identified Ms. Haynes "as the No. 2 witness on its April

24, 2019 witness list, behind only the company's CEO." (*Id.* 3.)

## B. Virginia Rule of Professional Conduct 3.7

Virginia Rule of Professional Conduct 3.7(a), often referred to as the witness-advocate

rule, states: "A lawyer shall not act as an advocate in an adversarial proceeding in which the

lawyer is likely to be a necessary witness." Va. R. Prof. Conduct 3.7(a).[18] Aside from three

enumerated exceptions,[19] the Rule "is mandatory and may not be waived." *Premium Prods., Inc.*

*v. Pro Performance Sports, LLC*, 997 F. Supp. 2d 433, 436 (E.D. Va. 2014). The witness-

advocate rule "is a 'prophylactic rule designed to protect the interests of the client, the adverse

party, and the institutional integrity of the legal system as a whole." *Id.* (quoting *Estate of*

*Andrews by Andrews v. United States*, 804 F. Supp. 820, 823 (E.D. Va. 1992)). "Ultimately, a

testifying advocate threatens the interests of the judicial system as a whole because of the 'public

perception that a testifying advocate has distorted the truth on the stand in order to advance his or

her client's cause and prevail in the litigation." *Id.* (quoting *Andrews*, 804 F. Supp. at 824).

Pursuant to Rule 3.7, the Court "must first determine whether the attorney is a

'necessary' witness." *Metro. P'ship, Ltd. v. Harris*, No. 3:06CV522-W, 2007 WL 2733707, at

*2 (W.D.N.C. Sept. 17, 2007). The moving party—here, National Union—bears the burden to

"demonstrate that the lawyer's testimony is 'strictly necessary,' and not merely relevant and

---

[18] Local Rule 83.1(I) for the United States District Court for the Eastern District of Virginia adopts the Virginia Rules of Professional Conduct as the professional ethics guidelines for practicing in the Eastern District of Virginia.

[19] These include situations in which: "(1) the testimony relates to an uncontested issue; (2) the testimony relates to the nature and value of legal services rendered in the case; or (3) disqualification of the lawyer would work substantial hardship on the client." Va. R. Prof. Conduct 3.7(a).

useful." *Tattoo Art, Inc. v. TAT Int'l, LLC*, No. 2:10CV323, 2010 WL 11469802, at *2 (E.D. Va. Oct. 18, 2010) (quoting *Sutherland v. Jagdmann*, No. 3:05CV042-JRS, 2005 WL 5654314, at *2 (E.D. Va. Oct. 31, 2005)). The court may either disqualify the attorney from acting as an advocate, or proscribe the attorney from acting as a witness. *See, e.g., id.*

"[A] court is 'not to weigh the circumstances with hair-splitting nicety but, in proper exercise of its supervisory power over the members of the bar and with a view of preventing the appearance of impropriety, it is to resolve all doubts in favor of disqualification.'" *Premium Prods., Inc.*, 997 F. Supp. 2d at 438 (quoting *United States v. Clarkson*, 567 F.2d 270, 273 n.3 (4th Cir. 1977)). If an attorney is disqualified, he or she may assist in the preparation of the case or assist at trial in a non-advocacy role. *See Ford Motor Co. v. Nat'l Indem. Co.*, No. 3:12cv839, 2013 WL 4498698, at * 7 (E.D. Va. Aug. 21, 2013).

### C. Because Ms. Haynes Is a Necessary Witness, the Court Will Exclude Her From Participating as Quality Plus's Trial Counsel

Because Ms. Haynes appears to be a necessary witness and none of the exceptions to Rule 3.7 apply, the Court will exclude her from acting as trial counsel for Quality Plus.

### 1. Ms. Haynes Is a Necessary Witnesses

As the party seeking to exclude Ms. Haynes, National Union bears the burden to show that Ms. Hayne's testimony "is strictly necessary, and not merely relevant and useful." *Tattoo Art, Inc.*, 2010 WL 11469802, at *2 (internal quotation marks and citations omitted). Here, National Union identifies several issues on which Ms. Haynes may testify, including "[Quality Plus's] communications with National Union about coverage," "[Quality Plus's] investigation of the emails and wire transfers," and "[Quality Plus's] claimed damages." (Mem. Supp. Mot. Disqualify 6.)

In response, Quality Plus states that Ms. Haynes "has no first-hand knowledge and cannot testify about either the emails to [Quality Plus] or the wire transfers themselves, since she had no role in or knowledge of those at the time they occurred." (Resp. Mot. Disqualify 4, ECF No. 38.) However, as detailed in Gay's sworn declaration, Ms. Haynes "was responsible for, among other things, handling all detailed communications with the overseas banks and U.S. and foreign law enforcement authorities, including providing all documentation required by the FBI and Secret Service and Hong Kong police. She handled all communication with outside Hong Kong counsel hired for recovery." (Gay Decl. 7.)

To "proper[ly] exercise its supervisory power over the members of the bar and . . . [to] prevent[] the appearance of impropriety," the Court will "resolve all doubts in favor of disqualification." *Premium Prods., Inc.*, 997 F. Supp. 2d at 438 (citation omitted). In his declaration Gay states that Ms. Haynes "provid[ed] all documentation required by the FBI." (Gay Decl. 7.) National Union states that this documentation included a report "that at least one email originated from Nigeria." (Mem. Supp. Mot. Disqualify 6.) This information is relevant to the disputed issue of whether the sender transmitted the email from within the Territory defined in the Policy. If Ms. Haynes's testimony is construed to show that Quality Plus believed that the sender transmitted the emails from outside the defined Territory, such that coverage would not apply, Quality Plus will likely wish to cross-examine Ms. Haynes to discredit this contention. Rule 3.7 "is a 'prophylactic rule designed to protect the interests of the client, the adverse party, and the institutional integrity of the legal system as a whole.'" *Premium Prods., Inc.*, 997 F. Supp. 2d at 436 (quoting *Andrews*, 804 F. Supp. at 823). Allowing Ms. Haynes to serve as trial counsel *and* to testify on an issue that is related to a disputed fact—one that goes to

the heart of the dispute—would not protect these interests. Therefore, Ms. Haynes will likely be a necessary fact witness, meaning that Rule 3.7 applies.

### 2. Because Ms. Haynes Will Testify to More than Her Legal Fees, None of the Exceptions Apply

Rule 3.7 provides three exceptions in which an attorney who constitutes a necessary witness may act as both attorney and witness: "(1) the testimony relates to an uncontested issue; (2) the testimony relates to the nature and value of legal services rendered in the case; or (3) disqualification of the lawyer would work substantial hardship on the client." Va. R. Prof. Conduct 3.7(a). Because Ms. Haynes's testimony will go to more than the nature and value of legal services rendered, none of these exceptions allow her to both testify and act as trial counsel.

First, as explained *supra*, the Parties dispute the location from which the sender transmitted the emails. If Ms. Haynes sent information to the FBI that the email's IP addresses originated in Nigeria, this provides a glimpse into Quality Plus's belief as to the sender's location. This information goes beyond an uncontested issue. In fact, it goes to the heart of the dispute and affects whether Quality Plus may obtain coverage under the Policy.

Second, if the Court determines that the Policy provides coverage, then Ms. Haynes will likely testify to the nature and value of the legal services she rendered. However, because her potential testimony goes beyond legal fees, this exclusion does not apply.

Finally, because Quality Plus will still be represented by Nathan Colarusso, Assistant General Counsel for Quality Plus, Quality Plus will not experience "substantial hardship" if the Court disqualifies Ms. Haynes from acting as trial counsel. *Id.* The Court notes that Mr. Colarusso appeared alone for the Initial Pretrial Conference. Further, Ms. Haynes may continue to assist Mr. Colarusso in preparing for trial and may assist at trial in a non-advocacy role. *See*

*Ford Motor Co.*, 2013 WL 4498698, at *7. For these reasons, Quality Plus will not suffer substantial hardship if the Court disqualifies Ms. Haynes.

Because none of the exclusions apply, the Court will disqualify Ms. Haynes from acting as trial counsel for Quality Plus at the upcoming bench trial.

### D. Conclusion: Motion to Disqualify

For the foregoing reasons, Ms. Haynes constitutes a necessary witness and none of the exceptions to Rule 3.7 apply to allow her to serve as both trial counsel and witness. However, Ms. Haynes may assist in preparation for trial and may assist at trial in a non-advocacy role.

## V. Conclusion

For the foregoing reasons, the Court will deny the Quality Plus Motion for Summary Judgment, the National Union Motion for Summary Judgment, and the Motion *in Limine*. The Court will grant the Motion to Disqualify. Because the Court will deny the Cross Motions for Summary Judgment, this matter will proceed to a bench trial.

An appropriate Order shall issue.

/s/
M. Hannah Lauck
United States District Judge

Date: 1/15/2020
Richmond, Virginia